# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

CHERYL ANDERSON,

         Plaintiff,

vs.

MICHAEL J. ASTRUE[1],
Commissioner of Social Security,

         Defendant.

No. C06-3066-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Cheryl Anderson seeks judicial review of a decision by an administrative law judge ("ALJ") denying her application for Title II disability insurance ("DI") benefits.  Anderson claims the ALJ erred in rejecting the opinions of her treating physician, evaluating the evidence improperly, and stopping the sequential evaluation process at step four.  (*See* Doc. Nos. 6 & 8)

## II.  PROCEDURAL AND FACTUAL BACKGROUND

### A.  *Procedural Background*

On December 11, 2001, Anderson filed an application for DI benefits, alleging a disability onset date of March 14, 2001.  Through discussion with Anderson's attorney at the ALJ hearing (R. 381-83), it appears Anderson's disability onset date was amended to November 7, 2001.  (*See* R. 12-13)  Anderson claims she is disabled due to "[m]ental illness specifically dissociation with depression and post traumitic [sic] stress disorder.

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA").  On February 12, 2007, Michael J. Astrue became Commissioner of Social Security.  He therefore is substituted as the defendant in this action.  *See* Fed. R. Civ. P. 25(d)(1).

Also back problems – having difficulty sitting and standing." (R. 78) She claims her mental problems cause her severe difficulty in working with others, while her depression makes it difficult for her to work alone. She further claims her back problems make it painful for her to sit or stand. (*Id.*)

Anderson's application was denied initially and on reconsideration. She requested a hearing, and a hearing was held on June 3, 2004, before Administrative Law Judge ("ALJ") Jean M. Ingrassia. Anderson was represented at the hearing by attorney Blake Parker. Anderson testified at the hearing, as did Vocational Expert ("VE") Carma Mitchell. On November 12, 2004, the ALJ ruled Anderson was not disabled. (R. 12-18) Anderson appealed the ALJ's ruling and on August 31, 2006, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. 5-8)

Anderson filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 1) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Anderson filed a brief supporting her claim on January 22, 2007. (Doc. No. 6) The Commissioner filed a responsive brief on March 15, 2007. (Doc. No. 7) Anderson filed a reply brief on March 23, 2007. (Doc. No. 8) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Anderson's claim for benefits.

### B. Factual Background

### 1. Introductory facts and Anderson's hearing testimony

Anderson was born in 1970. She is 5'4" tall, and at the time of the 2004 hearing, she weighed about 250 pounds. She indicated her weight has increased because she is

Case 3:06-cv-03066-MWB   Document 10   Filed 11/19/07   Page 2 of 42

unable to get up and move around like she used to. (R. 347-48) She is single. She has a driver's license and drives as needed in her everyday life.

Anderson graduated from high school. She obtained a two-year degree in law enforcement at Iowa Central Community College, and in 2002, she received a Bachelor of Science in Public Administration from Upper Iowa University. (R. 348-49)

In 1997, Anderson went to work as a police officer in the City of Corning, Iowa. She was sent to the Iowa Law Enforcement Academy, and while she was there, she had mental health difficulties, problems getting along with others, and problems with authority. She was referred to a psychologist for evaluation, and, according to Anderson, she was not allowed to complete the Academy training and was discharged from her job based on the results of the psychological assessment. (R. 349-50; *see* R. 73)

She next worked as a counselor at a "boot camp" for delinquent youth. She worked at night on a substance abuse residential floor, and spent most of her time walking the hallways while the residents slept to be sure they would not run away. She spent some time on the job talking with youthful offenders. (R. 102, 351) She was fired from the job in March 2001. According to Anderson, she was fired due to "repeated problems with [her] mental health issues to the point where one of the supervisors there even called [Anderson's] counselor . . . and said that he was concerned about [her] even, to the point where [she] might be harmful to the kids there." (R. 351)

She next worked as a teller at a credit union drive-through. Anderson stated she was fired from this job because of repeated mistakes and difficulty concentrating. (R. 101, 352) She next worked as a security guard at a factory. She stated she was fired from that job because she had difficulty getting along with the management. (R. 100, 352) She then worked as a customer service representative through a temporary agency. (R. 98, 353) The agency sent her to a couple of different banks, but she again had problems with

3

making mistakes and forgetting things. She also had problems with interpersonal relationships on the job. (R. 353)

Most recently, Anderson worked for a few days as a substitute teacher in the Webster City and Northeast Hamilton school districts. She worked for one six-hour day as a paraprofessional for the schools. She stated she was invited back to that job, but she declined because the job required her to stand for prolonged periods, and to get up and down from sitting to standing frequently. Anderson stated these activities bothered her back and she had to lie down immediately after she got off work. (R. 354-55)

She stated that she tried working half days at a Subway for about a month, but she would have to go home after work and lie down for the rest of the day. She was so tired from working that she was unable to cook dinner or do any household chores. (R. 357) She quit the job because she was unable to get out of bed one day due to back pain. She indicated it took her "about two hours just to be able to get to the phone and call them and say [she] couldn't come in that day." (R. 358)

Anderson had back surgery at the University of Iowa Hospital in 2002. She continued to have back pain after the surgery, and she was referred to a two-week back pain clinic. However, she was sent home following the initial assessment because, according to Anderson, the doctors felt she could not complete the two-week program. Anderson stated that after she slept in the hospital bed for one night, she could barely get up to use the bathroom. (R. 355-56)

Anderson stated her pain occurs in her lower back, radiating down the backs of her legs all the way to her toes. She indicated that at times, her back hurts enough to make her want to cry and it affects her mood. Since her attempt to participate in the back pain clinic at the University of Iowa, she has not seen a doctor for her back pain. According to Anderson, her doctors stated her back pain is chronic and they declined to prescribe any medication for the pain. (R. 358-59)

4

Anderson sees a mental health counselor on a frequent basis, and a doctor monitors her prescription medications. She stated her medications make her quite thirsty and suppress her libido. According to Anderson, her doctors attempted to put her on medication for attention deficit disorder (ADD), but the medication elevated her blood pressure so it was discontinued. It is Anderson's understanding there is no medication doctors can give her for ADD because all of them would elevate her blood pressure. (R. 356-57)

Anderson stated her mother helps her pay bills on time and keep her checkbook. Anderson indicated she is extremely forgetful. For example, she has forgotten on numerous occasions to replace her gas cap after filling her car with gas, to the point that she has stopped buying new gas caps. She is distracted easily and finds herself having to do things over again because she is unable to remember if she finished a task. (R. 359-60)

At the time of the ALJ hearing, Anderson was living alone in an apartment three houses down from her mother. She moved out of her mother's house because, according to Anderson, she was unable to get along with her mother due to Anderson's mental health problems. (R. 360) Anderson's mother is the landlady of the apartment and lets Anderson live there rent-free. In addition, her mother pays her utilities and pays for her food and other needs. (R. 368) According to Anderson, she does not qualify for food stamps because she has an IRA. (*Id.*)

Anderson described sleep difficulties, indicating she awakens from back pain and muscle spasms in her back. To relieve the pain, she gets up and walks around. She is able to go back to sleep, but stated it takes awhile, and sometimes her mind races and her thoughts keep her from returning to sleep easily. She often finds herself returning to bed at around 6:00 a.m., after a period of sleeplessness. (R. 361)

On a typical day, Anderson gets up at about 11:00 a.m. She brushes her teeth and gets dressed, and then fixes her lunch, which usually is something she can put in the

microwave. After lunch, she may watch television or go to the library. She stated she gets up and sits down frequently throughout the afternoon, both because of her back discomfort and also because she has difficulty sitting still and concentrating on things. When she watches TV, she frequently rewinds and watches scenes repeatedly because she is unable to pay attention long enough to follow what is happening in the story. She indicated she does tasks in steps to make them easier. For example, one day she might put clothes in the washer to have them ready to wash, and then actually wash them the next day. (R. 362-63)

Anderson stated she seldom sees other people during an average day. She has a couple of friends she visits from time to time, but she is unable to go out with her friends because of her back pain. She stated her friends like to go four-wheeling and dancing, and her back condition prevents her from doing those activities. She stated the last time she went out and did things with friends was in about 1995. (R. 364)

Anderson enjoys painting little miniatures for her nephew, but she stated she can only sit and do that for "a little bit," and then she has to get up and move around. She does not attend church or belong to any other organizations. (R. 365)

Anderson stated she has been involved with vocational rehabilitation (Voc Rehab) for awhile. Part of her education was paid for by Voc Rehab. When she obtained her B.S. degree, she was going to school in the evening, taking three- and four-hour courses. She stated her grades fluctuated. There were times her back hurt so much that her mother had to drive her to class. Anderson indicated she had tried numerous jobs over the three years preceding the ALJ hearing, but there was nothing she was able to tolerate due to her back pain and concentration difficulties. According to her, she and her vocational counselor looked through all of the jobs Voc Rehab had available, and there were no jobs that fit the combination of Anderson's abilities and limitations. She does not believe she

6

is employable due to the combination of her physical and mental problems. (R. 366, 367-69; *see* R. 369-70)

Anderson stated she takes 150 milligrams of Zoloft once daily. The medication helps her but she still is very forgetful. She is not seeing a psychiatrist. (R. 370) Anderson stated if she were to get a job, it would have to be one with low stress and that did not involved a lot of contact with other people. In addition, she would want to work in her local community, where she has a bit of a support system. (R. 375-76) She indicated that even filling out a questionnaire for her attorney was quite stressful. She was unable to complete the form without assistance, and she called someone to help settle her down because she felt so stressed. (R. 377)

### 2.     *Anderson's medical history*

On February 6, 1997, Philip L. Ascheman, Ph.D. saw Anderson for a psychological evaluation at the request of the Corning Police Chief. Dr. Ascheman summarized the background for the evaluation as follows:

> According to the records, the patient displayed unusual and concerning behaviors while at the [Iowa Law Enforcement] Academy. These included sleeping with her ASP baton and handcuffs, chasing classmates from her room, commenting that a slide rule was a tool of the devil, indicating to a classmate that throwing darts were like knives and could be used to kill, refusing to engage in conversation because she believed that others were trying to trick her, laughing for no apparent reason, and a variety of other peculiar behaviors. The patient's refusals to participate in a variety of activities, her lack of apparent motivation, and conflict with various authority figures, were also extensively detailed.

(R. 165)

Anderson reported that she had been abused sexually between the ages of ten and twelve, and her primary reaction to stressors since that time has been to dissociate and

7

allow her mind to go blank. Dr. Ascheman administered the Minnesota Multiphasic Personality Inventory-2 to Anderson, and noted Anderson's responses "resulted in a valid and interpretable profile." (R. 167) Based on the evaluation, Dr. Ascheman diagnosed Anderson with Dissociative Disorder, and Adjustment Disorder with Depressed Mood. He found Anderson was "not suitable for employment as a police officer," noting she tended to dissociate when under stress and could endanger herself and others. He noted the potential danger Anderson could pose included the potential that she could fire her weapon without conscious awareness of her actions, something she had done while at the Academy. (R 166)

Anderson saw psychiatrist Gaylord Nordine, M.D. for several months beginning sometime prior to November 18, 1999, and ending in May 2000. The doctor apparently prescribed Depakote (a drug used to treat seizures, and the manic episodes associated with bipolar disorder), which Anderson took during this time period. (*See* R. 171, 176) Anderson exhibited dissociation, difficulties with intense dreams, and difficulties dealing with stressors she was experiencing at school. In May 2000, when Anderson learned the doctor's intent in her therapy was to help her focus on new goals, objectives, and strategies, rather than to advocate for her return to police work, Anderson became angry and discontinued her therapy. (R. 168)

In April 2000, Anderson saw Axel T. Lund, M.D. with complaints of aching and swelling in her feet and ankles. Anderson told Dr. Lund she had been dismissed from her job as a police officer because she had become overweight. She stated she felt her regular doctor was not helping her with her weight loss and she wanted a second opinion. Dr. Lund ordered thyroid function tests and recommended Anderson lose 100 pounds. He also noted Anderson had "lost her confidence in Dr. Nordine." (R. 176-77)

On September 19, 2000, Anderson saw Haydee Stewart, M.D. with complaints of back pain and foot pain. She was requesting a renewal of her handicap parking permit,

8

stating she had problems walking more than 200 feet without assistance. Notes indicate that at this time, Anderson weighed 245 pounds. Dr. Stewart administered two "[t]rigger joint injection" at the sacroiliac joint areas. He noted if Anderson's pain had not decreased in two weeks, he would refer her to an orthopedist. He also noted Anderson should be screened for diabetes, and he indicated she needed to "lose weight with behavior modification." (R. 175)

Anderson returned to see Dr. Stewart on October 3, 2000. She continued to complain of intermittent pain in her low back and both feet. Dr. Stewart indicated Anderson's "main problem is . . . obesity." (R. 174) He prescribed Flexeril two to three times daily, and Vicodin every four to six hours for pain. He advised Anderson to lose weight with behavior modification, diet, and exercise, noting her weight was the primary cause of her chronic low back pain. (*Id.*)

On March 13, 2001, Anderson saw Michael E. Tindall, D.C. with complaints of pain and stiffness in her lower back and the sacroiliac area on the left, and dull pain in the buttocks and the back of the upper left leg. She reported having the pain for about two weeks, and opined the pain was "just from bad posture and sitting wrong." (R. 199) The doctor treated Anderson with spinal adjustment, heat packs, and vibromassage, and directed her to return as needed. (R. 198-99) Anderson returned to see the doctor the next day for another spinal adjustment, heat packs, and vibromassage. She reported slight improvement in her pain since the previous day's treatment. (R. 197-98)

Anderson returned to see Dr. Tindall on September 28, 2001. She reported onset of pain and stiffness in her lower back and the sacroiliac area two days earlier, but she was unaware of any particular cause. She also reported muscle spasms in her mid to low back on the right, and pain in that area during movement. She indicated she was losing sleep due to her discomfort and pain was interfering with her normal daily routine. Dr. Tindall diagnosed Anderson with lumbar subluxation, lumbar arthralgia/lumbalgia, and muscle

9

spasms. He treated her with spinal manipulation, heat packs, and vibromassage. (R. 196-97) Anderson saw the doctor again the next day, and reported some improvement in her mobility, range of motion, and ability to sleep. She again was treated with spinal adjustment, heat packs, and vibromassage. (R. 195-96)

During October 2001, Anderson saw a different chiropractor, Jeffery A. Butler, D.C., for the same problems with lower back pain. She saw Dr. Butler on October 11, 12, and 23, 2001. (R. 184-86) He diagnosed Anderson with Sacroiliac Arthralgia, Lumbalgia, and Sciatica. In a brief report to the disability examiner dated January 4, 2002, Dr. Butler indicated Anderson had a positive response to treatment but not a complete resolution of her complaints. (R. 183)

Anderson returned to see Dr. Tindall on November 2, 2001, complaining of worsened symptoms. The doctor noted slightly worsened muscle tightness and tenderness in Anderson's mid to low back. She was treated with a spinal adjustment, vibromassage, and heat packs. (R. 194-95)

Anderson returned to see Dr. Stewart on November 5, 2001, complaining of severe back pain that was interfering with her ability to sleep. The doctor administered another trigger joint injection, and gave Anderson samples of Ultracet and Skelaxin. (R. 174)

On November 15, 2001, Anderson appeared at a walk-in clinic complaining of low back pain, radiating across her back and into her things. She reported seeing a chiropractor for four treatments with no relief. (R. 179) X-rays were taken of her lumbar spine, and showed "joint space narrowing at the L4-5 and L5-S1 levels with minimal degenerative spurring," with no other abnormalities noted. (R. 181)

Anderson apparently saw Herbert L. Notch, Ph.D. of Eyerly-Ball Community Health Services for mental health therapy beginning in July 2000, although no treatment notes appear in the record. On January 8, 2002, Dr. Notch wrote the following report to the state disability examiner regarding Anderson's work-related functional capacity:

Cheryl has recently moved to the Fort Dodge area and was encouraged to follow up with services in her new location. She has apparently done that.

**Mental Status:**

Cheryl has been in treatment here since 7-17-00. She has been followed for medication and psychotherapy. She has a diagnosis of Depression with a great deal of unresolved anger. She worked on both of those symptoms while here and responded well.

She was encouraged to continue mental health treatment along with vocational services. Cheryl is a fairly closed person who finds it difficult to self disclose. Once she becomes more familiar with treating or contact persons in her life she becomes more open and makes progress.

She is close to completing a bachelor's degree and plans to do that. She has good skills to draw from if she can match her skills to vocational settings that will work for her.

**Functional Assessment:**

Cheryl can understand tasks and instructions to a moderate degree. She can carry out instructions to a moderate degree as well. Her attention, concentration and pace appear adequate for moderately complex tasks. She has marked limitations in her ability to relate effectively in an ongoing manner with supervisors and coworkers. In each of her job capacities in the past, she has had significant problems with irritability, with anger, with paranoid feelings and a feeling that she is being treated unfairly. She would likely need special considerations such as time away from work and opportunity to work through pressures on an as needed basis. She would likely be unable to handle the stress of work on a competitive basis. She has been working over the past number of years, ever since graduating from the law enforcement academy as a police officer. However, each of her employment settings has been problematic in regard to interaction with supervisors and coworkers. She tends to be withdrawn and quiet and does not

11

easily express her anger, but she does deal with it in therapy. She has no side effects from her meds.

She is able to manage benefits if she is given them.

(R. 188-89)

On January 31, 2002, Dr. Tindall wrote a report concerning Anderson's physical work restrictions. (R. 190-91) In the report, Dr. Tindall indicated the following:

> The patient, Cheryl Anderson, exhibits manifestations of a[] herniated L4-L5 disc in the lumbar spine. She has an antalgic lean due to uncontrolled muscle spasms in the lower back and is unable to do any physical activity at this time without further aggravating her condition. She has had a past history of surgery on the lower lumbar spine for a past herniation. I referred her to a[n] orthopedic surgeon in Des Moines for further evaluation.
>
> **Prognosis:** Unfavorable for continued chiropractic care. Cheryl has been referred to a specialist. Her current prognosis is guarded and her status for recovery is limited due to prior lower back surgeries.
>
> **Restriction Data:** The patient is not restricted from a cold environment. . . . The patient may use [her hands] for simple grasping, for firm grasping, and for fine manipulation. The patient is not restricted from marked changes in temperature and exposure to dust, fumes, and gases. The patient is restricted from driving automotive equipment.
>
> **Disability Data:** No repetitive motion is allowed that involves movem[e]nt in the lumbar spine. Because of the musculo-skeletal complications, pulling objects requires unusual strain. This patient is not allowed to pull objects at this time. Twisting sometimes complicates musculoskeletal balance. The patient may not do any twisting movements. Bending at the waist is not allowed at this time. This patient [is] unable to walk any distance at this time without aggravating her condition. These restrictions will remain in force at least in the foreseeable future.

12

The patient has been recommended for lower back surgery and may or may not have a complete recovery. In a normal work period of 8 hours (with the usual breaks), this patient would not be able to carry any objects of any weight what so ever [sic]. This patient may not squat. During the patient's normal work period, this patient is unable to crawl. This patient is not allowed to participate in work tasks that involve[] repetitive motion. This patient [is] unable to stand for any lenght [sic] of time over two to three minutes. The patient is unable [to] sit and travel for very long or any distances over 10 miles. This patient is unable . . . to push any objects at this time.

**Additional comments:** I have not talked to Cheryl or the specialist since her last visit in this office. She probably has a ruptured lower lumbar disc and will require surgery. She was unable to have any normal activities or work at the time of her last visit.

(R. 190-91)

On February 16, 2002, Dennis A. Weis, M.D. reviewed Anderson's medical records and completed a Physical Residual Functional Capacity Assessment form. (R. 200-208) Dr. Weis concluded that Anderson "has evidence of mild degenerative disease of the lumbosacral spine but has had only intermittent treatment for this condition," and she had "no evidence of motor or neurologic defects." (R. 208) He further indicated Anderson's treating sources had not provided estimates regarding Anderson's residual functional capacity. This suggests that Dr. Weis did not have the benefit of all of Anderson's records. (*See, e.g.*, R. 190-91[2]) Dr. Weis opined Anderson would be able to lift up to twenty pounds frequently and ten pounds occasionally; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and push/pull without limitation. He indicated she could do all types of postural activities

_____

[2]It appears Dr. Weis had only Dr. Butler's chiropractic records from October 2001, and Dr. Butler's report dated January 4, 2002, but he did not have Dr. Tindall's treatment records.

Case 3:06-cv-03066-MWB   Document 10   Filed 11/19/07   Page 13 of 42

occasionally, and she would have no manipulative, visual, communicative, or environmental limitations. (R. 200-204)

On February 27, 2002, Carole Kazmierski, Ph.D. reviewed Anderson's records and completed a Psychiatric Review Technique form (R. 209-22), and a Mental Residual Functional Capacity Assessment form (R. 223-27). She found Anderson to have an Affective Disorder, specifically "depression with a great deal of unresolved anger" (R. 212); and a Personality Disorder, specifically "dissociative disorder by [history]." (R. 216) She opined these conditions would cause Anderson to be mildly restricted in her activities of daily living, and moderately limited in maintaining social functioning, and in maintaining concentration, persistence, or pace. She found Anderson had had one or two episodes of decompensation, each of extended duration. (R. 219)

On the mental RFC form, Dr. Kazmierski opined Anderson would be moderately limited in her ability to maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruption from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (R. 223-24)

In her written comments, Dr. Kazmierski noted Anderson had exhibited problems relating effectively to others and managing workplace stress. She found Anderson's mental impairments to be severe, although not to the degree required to meet any mental listing. The doctor offered the following observations regarding Anderson's work-related mental abilities:

> Claimant's interpersonal difficulties are well-documented and would appear to be her biggest barrier to successful

14

employment. Many of the jobs that claimant has held in the past have required highly developed interpersonal skills – working as a counselor, a police officer, or customer service representative. Given claimant's poor interpersonal skills, her low frustration tolerance, and her problems with affect regulation, these jobs seem a very poor fit for claimant, and it is not surprising that claimant has had difficulties in these settings. Despite her interpersonal difficulties, claimant was able to maintain a job as a counselor for disturbed youth – obviously a stressful and demanding job – for approximately three years. Claimant now lives with her mother and notes on her application form that her mother "does not know" about her mental health problems. That her mother would be unaware of any mental health difficulties suggests that claimant must be somewhat successful in controlling anger outbursts, irritability and paranoia at least in her home setting. As Dr. Notch points out, claimant does have the ability to maintain attention and concentration for the performance of moderately complex tasks. She is working toward completion of a bachelor's degree. She will do best in settings where she can work by herself and where interpersonal demands are minimal. In such a setting, she is capable of performing both simple and moderately complex tasks.

(R. 227-28)

On May 10, 2002, Anderson was seen for evaluation in the Orthopedic Clinic at the University of Iowa Hospitals and Clinics. She reported having low back pain for six to eight months which caused her difficulty with walking, sitting, and sleeping. She indicated she had "noticed a shift in her spine towards the left-hand side," and she had occasional pain in both anterior thighs. She stated her daily activities were limited due to her back pain. In addition, she stated her right arm hurt occasionally and her left arm hurt frequently. Upon examination, doctors found Anderson to have marked restriction of flexion/extension range of motion; normal hip range of motion; fair to good strength in her lower extremities; normal pulses in her lower extremities; and a significant list to the left side. (R. 260-63) An MRI of Anderson's back showed "a large extruded disc fragment

15

at L4-5, which [was] rather mid-line with effacement of the dural sac and cauda equina." (R. 263)  X-rays also suggested Anderson had impingement of the left L5 nerve.  (R. 266) Doctors elected to treat Anderson conservatively at first, and an epidural steroid injection was administered.  (R. 263, 267)

Anderson returned to the Orthopedic Clinic for follow-up on July 5, 2002.  She stated the epidural steroid injection had not provided her with any relief, and she complained of pain radiating down her right leg, often all the way to the ankle after five to ten minutes of standing.  She indicated she spent most of her time lying down.  Doctors recommended decompression surgery, and Anderson elected to go forward with the surgery.  (R. 257-59)  On July 30, 2002, Anderson underwent an L4-5 laminotomy and partial discectomy bilaterally.  (R. 255-56)  She was discharged from the hospital on July 31, 2002, in stable condition, with instructions not to lift more than ten pounds and "brace when out of bed."  (R. 253)

On July 17, 2002, psychiatrist Richard Ajayi, M.D. of North Central Iowa Mental Health Center performed a psychiatric evaluation of Anderson on referral from Voc Rehab, to determine if Anderson would benefit from treatment.  (R. 282-85)  Anderson stated that until a year earlier, she was receiving treatment from a Dr. Kent Kunze in Des Moines, and she was taking Depakote and Celexa.  Dr. Ajayi had reviewed a copy of a letter from a nurse, also signed by Dr. Kunze, indicating Anderson "had a diagnosis of bipolar disorder, type II and borderline personality disorder."  (R. 282)  Anderson also had been evaluated by a doctor in Omaha, "who diagnosed her with dysthymic disorder and dissociative disorder," as well as a possible personality disorder, NOS.  (*Id.*) Anderson stated that since she had stopped taking her medications, she had begun having more difficulty paying attention and maintaining concentration, but she did not "feel particularly depressed or unhappy."  (*Id.*)  She reported feeling "somewhat hopeless and rather unmotivated," and she often was forgetful and lost things.  (*Id.*)  However, she had

16

not noticed any changes in her appetite, sleep, or energy level. She had just finished her degree in public administration. (*Id.*)

During the evaluation, Dr. Ajayi noted Anderson was "somewhat anxious and fidgety." (R. 284) She was vague, often spoke in a monotone, and had a blunted affect. Dr. Ajayi diagnosed Anderson with "PTSD – chronic form 309.81"; "Dysthymic Disorder"; "Bipolar Disorder – by history"; and "Cluster A Personality Disorder." (*Id.*) He assessed her Global Assessment of Functioning ("GAF") at 35 to 45, both currently and at its highest during the previous year.[3] The doctor indicated Anderson would benefit from a combination of medication and psychotherapy, but Anderson "refused to try any medicines." (*Id.*) She agreed to begin counseling with Rhonda Wykoff, LMSW, provided Voc Rehab would pay for her treatment. (*Id.*) It appears Voc Rehab would not pay for Anderson's therapy at that time. (*See* R. 286, noting Anderson "did not follow through with therapy . . . due to financial reasons.") However, Voc Rehab later authorized payment for Anderson's treatment. (*See* R. 153)

On August 8, 2002, at the reconsideration stage of Anderson's application for disability benefits, Dee E. Wright, Ph.D. reviewed the record and reached findings similar to those reached by Dr. Kazmierski, although Dr. Wright found Anderson had never had

---

[3]     The GAF scale is a 'hypothetical continuum of mental health-illness' used to determine 'psychological, social, and occupational functioning.' *See* DSM-IV, at 32. . . . The GAF scale goes from 0-90. The relevant scores for this case are 71-80 -- no more than slight impairment in social and occupational functioning, 61-70 -- mild symptoms or some difficulty with social and occupational functioning, 51-60 -- moderate symptoms or moderate difficulty with social and occupational functioning, 41-50 -- serious symptoms or serious impairment with social and occupational functioning, and 31-40 -- some impairment in reality testing or communication or major impairment in several areas such as work, family relations, and judgment.

*Bartrom v. Apfel*, 234 F.3d 1272 (Table), 2000 WL 1412777, at *1 n.3 (7th Cir. Sept. 20, 2000).

an episode of decompensation of extended duration. (R. 244; *see* R. 229-47) The doctor further found there was no evidence to indicate Anderson's mental health had deteriorated significantly since Dr. Kazmierski's review. (R. 233)

Dr. Wright found Anderson to have the following restrictions:

> The evidence in file would indicate that the claimant has moderate cognitive restrictions of function secondary to variable sustained attention and concentration. The claimant would have difficulty consistently performing extremely complex cognitive activity that would require prolonged attention to minute details and rapid shifts in alternating attention. Despite these restrictions, the claimant is currently able to sustain sufficient concentration and attention to perform non complex, repetitive, and routine cognitive activity when it is in her interest [to] do so.

> The evidence in file would indicate moderate restrictions of function with social interaction [when] the claimant is unduly stressed. The claimant would function best in settings where she [is] not required to have frequent stressful contact with individuals. The claimant did have a previous demanding [and] stressful job as a counselor for disturbed youth. It might be difficult for this claimant to return to a job with similar activities. In a less stressful job, the claimant could sustain short-lived, superficial interaction with others when it was [in] her interest [to] do so. She does possess adequate expressive and receptive language skills.

> The evidence in file does not indicate the claimant is currently manifesting marked limitations of function with self care or other activities of daily living from a psychological perspective. The claimant is alleging a number of limitations of function performing ADLs secondary to physical difficulties. These allegations will be evaluated by our medical staff. The claimant indicates that she is able to prepare meals for herself. The claimant indicates that she is able to operate a motor vehicle when necessary. She reports that she is able to use public transportation. The claimant indicates that she is no longer taking any medication. The claimant indicates that she

18

> does use the computer and does list[en] to news programs. She reports some difficulties interacting with others socially when she has been stressed. The claimant reports difficulties with sustained concentration and attention.
>
> In summary, the evidence in file indicates the claimant is diagnosed with medically determinable mental impairments – a Depressive Disorder, NOS and a Dissociative Disorder. The claimant's diagnosed medically determinable mental impairments do create some moderate restrictions of function for the claimant; but these restrictions of function do not currently meet or equal . . . listing severity. The claimant's allegation is credible. The evidence in file is consistent and does reflect the claimant's limitations of function as described.

(R. 233)

On September 25, 2002, Anderson was seen for post-surgical follow-up at the Orthopedic Clinic. She reported "significant improvement in her pain from preop." (R. 249) She had been walking about a mile a day without difficulty and she had no pain in her back or legs. She was exercising, losing some weight, and feeling good. She reportedly was "still unemployed, but [was] actively looking for a job at this point." (R. 250)

On November 18, 2002, Chrystalla B. Daly, D.O. reviewed the record and completed a Residual Physical Functional Capacity Assessment form regarding Anderson. (R. 274-81) Dr. Daly opined Anderson could lift up to twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and push/pull without limitation. She found Anderson could perform most postural functions occasionally except she should never climb ladders, ropes, or scaffolds due to her obesity. She otherwise found Anderson to have no work-related physical limitations. (*Id.*)

On January 24, 2003, Anderson was seen for post-surgical follow-up. She complained of lower back pain. She stated she had begun working at a Subway in October

Case 3:06-cv-03066-MWB   Document 10   Filed 11/19/07   Page 19 of 42

2002, but the day-long standing greatly increased her low back pain, and she had to stop working after three weeks. She also was experiencing some radicular type pain in her right leg, going down into her foot and big toe. Notes indicate Anderson "was very vague in trying to remember her right lower extremity symptoms." (R. 328) Anderson stated her leg symptoms were worse than they had been prior to her surgery, although notes indicate this complaint was "not congruent with what [was] written in her last clinic note." (*Id.*) Anderson also complained of constant back pain, worse when she was standing or walking. She described sleep difficulties that she attributed to her back pain. She expressed frustration that her mother was not helping her more with housework, and Anderson appeared to be "a little upset that at her last visit she was told in the Back Clinic that she should be able to take care of most of her activities of daily living by herself." (*Id.*)

Doctors ordered a repeat MRI to rule out a recurrent herniated disc. They also ordered lab tests. They encouraged Anderson to increase her level of physical activity, noting her back pain was unlikely to improve unless she was compliant with her back exercises. (R. 328-29) The MRI showed "scar at L4/5 but no recurrence of disc herniation. Informed nerve roots were fine and no complications [were] noted." (R. 331) Doctors recommended Anderson "continue her P.T. exercises which she basically ridiculed," stating the exercises were not helpful. (*Id.*)

Anderson returned to the clinic for follow-up on February 28, 2003. Doctors explained the MRI results, and the fact that tests did not show signs of any recurrence, infection, or other complications from the surgery. They encouraged Anderson to participate in a Rehab Evaluation and then in their Rehab Program. Notes indicate Anderson "has understood that she has an injury to her intervertebral disc and that this causes increasing immobility." (R. 334) Anderson's physical condition, including her muscle tone and control of the motion of her low back, was noted to be less than optimal,

which doctors indicated would affect her low back pain. Anderson agreed to go forward with a Rehab Evaluation and, if indicated, also with the Rehab Program. (*Id.*)

On March 26, 2003, Anderson was evaluated by the University of Iowa Back Care Team for complaints of ongoing back pain. (R. 309-13) Doctors advised Anderson that although her pain was "extremely uncomfortable," they felt her pain was chronic in nature. They recommended "a much more active, positive approach to rehabilitation and overall improved mental and physical health." (R. 309) The doctors made the following specific recommendations:

> In terms of mental health it will be critical for you to begin to work with the mental health system in terms of monitoring current levels of depression, anger and anxiety. We have recommended an appointment at the local mental health center in Webster City and instructed you as to how to make contact with them regarding further follow-up. We feel it is imperative for you to be seen by a psychiatrist and then be directed in terms of further evaluation and treatment of mental health issues.
>
> In terms of your spine, we encourage you to begin immediately with the exercise and activity programs given to you by our staff. These are designed specifically to increase strength, flexibility, endurance and provide you with a solid base of physical training for improving strength and flexibility.
>
> We discussed various options for rehabilitation. At this time the entire Spine Team does not feel the two week Spine Rehabilitation Program here could be of assistance to you, primarily because of the format which is designed to work only in groups. We would be happy to continue to follow you here on a regular basis individually for on-going physical therapy and mental health recommendations.
>
> We did offer you the opportunity to see the Department of Psychiatry here, but you declined. This would involve you covering the cost of the evaluation here through your private resources. At any time that you would like the Department of

21

Psychiatry here to evaluate your mental health situation, we would be happy to coordinate and set up the appointment.

(R. 309-10)  In summary, the doctors recommended Anderson obtain evaluation by a psychiatrist, and make "a significant commitment . . . to increase physical activity, push [her]self physically and be willing to get involved in a very health[y], active approach to rehabilitation despite the pain."  (R. 310)

As part of her overall evaluation, Anderson underwent a cardiovascular evaluation by a physical therapist.  (R. 314-16)  Notes indicate Anderson weighed 258 pounds at this time.  The evaluator found Anderson had a present endurance level that would allow her to perform sedentary light to medium work tasks.  She recommended a conditioning program to improve Anderson's functional strength and endurance, including walking at a fast and consistent pace as tolerated; regular exercise five to seven days per week; and weight loss of at least 50 to 75 pounds.  (R. 316)  The evaluator indicated Anderson was "not a candidate for the UI Back Care Program" due to Anderson's "difficulty accepting responsibility for her medical well-being and her indifference to embracing initiation of a consistent exercise program."  (*Id.*)

Anderson also underwent a medical social work evaluation.  (R. 317-19)  Notes indicate Anderson expressed anger at "how the system ha[d] failed her," and she believed she would never find work due to ongoing "'discrimination' against her because of her past work history, her back problems and her 'psychological problems'."  (R. 318)  The evaluator reached the following impression from the evaluation:

I am very concerned about Cheryl Anderson.  She continues to show a great deal of behavior which reflects anger, bitterness, resentment and hopelessness as far as her personal and vocational situation.  She reports desperate financial straights, but, at this point in time does not appear ready to participate in the types of programs that we offer here which involve a great deal of group coping skills and physical therapy management.

22

> I do believe she needs a thorough psychiatric work-up to determine if some type of counseling or medication approach for either personality disorder or bi-polar may be appropriate for her.

> Unfortunately at this time I do not think she could benefit from our two week program based on her reluctance to become involved in any type of group activities and her continued perseverance on her past and the anger and bitterness that she feels towards the systems that have dealt with her previously.

(R. 318-19)

Anderson also was seen for a Psychological Evaluation. (R. 320-22) Valeria J. Keffala, Ph.D. indicated Anderson continually blamed others for things that had happened in her life, "showing little insight about her role in these events." (R. 321) She found Anderson to be highly suspicious of others and to see herself as persecuted and a victim. Dr. Keffala instructed Anderson in a breathing exercise for stress and pain management, advising her of the relationship between stress and pain. She recommended Anderson follow up with counseling and psychotropic medications as recommended. (R. 321-22) The doctor noted Anderson would not benefit from the University of Iowa's two-week Rehabilitation Program because she "did not want to be involved in any group activities." (R. 322)

On April 16, 2003, Anderson again was evaluated at North Central Iowa Mental Health Center, this time on self-referral. The evaluator was Joan Kitten, ARNP. Anderson was willing to try medication "if someone could pay for it." (R. 286) Anderson stated she was somewhat depressed and moped around a lot, but primarily she was angry. Her symptoms had improved somewhat since she moved out of her mother's house a couple of months before the evaluation. Anderson stated "she knew that she needed to get back into mental health services when her treatment team in Iowa City stated that her

Case 3:06-cv-03066-MWB   Document 10   Filed 11/19/07   Page 23 of 42

mental health needs were more than they could handle and dismissed her from physical therapy." (*Id.*)

Anderson stated she had undergone surgery to repair a ruptured disc, but the surgery "only made her back pain worse." (R. 287) She reported having chronic back pain, and stated it took her "hours to get up and go in the morning and this [was] a primary source of her anger." (R. 286) Ms. Kitten noted Anderson had "a great deal of difficulty arising from her chair in the waiting room when initially seen but after sitting in [Ms. Kitten's] office for 45 minutes, [Anderson] had no difficulty arising from her chair to go back to the waiting room." (R. 287) She observed that Anderson "was evasive, difficult to redirect and circumstantial"; "somewhat anxious in her discussions"; and she had a restricted affect and undeterminable mood. (*Id.*) She diagnosed Anderson with PTSD, Dysthymic Disorder, Cluster A Personality Disorder, and "Problems with primary support group; Problems relating to social environment; Unemployment." (*Id.*) She assessed Anderson's GAF at 40, both currently and at its highest during the previous year. (*Id.*)

Ms. Kitten recommended that Anderson start on a serotonin reuptake inhibitor (SSRI), and started her on Zoloft and Amitriptyline. She was referred to Rhonda Wykoff for individual therapy, and Ms. Kitten opined therapy "would be more productive than medication for Ms. Anderson in the long run." (R. 287-88) Although it appears Ms. Wykoff saw Anderson for individual counseling, overseen by a staff physician (*see* R. 292-93, 296-97, 301-02; *see also* R. 295), no treatment notes from those sessions appear in the record.

Anderson returned to see Ms. Kitten for medication follow-up throughout the next year. (*See* R. 289-304) She improved significantly on the Zoloft, not only mentally, but also in terms of her pain level and her ability to sleep. (*See* R. 289-91) On August 13,

2003, she stated she was "doing very well." (R. 291) She continued to have back pain, but her mood was greatly improved. (*Id.*)

At Anderson's medication follow-up on October 1, 2003, she stated she had "become more frustrated as she [had] been unable to find a job." (R. 294) She reportedly had completed an internship with Voc Rehab but still could not find employment. Ms. Kitten added Strattera to Anderson's medication regimen, "hopefully to improve memory and function as well as attention." (*Id.*)

On December 3, 2003, at Anderson's medication follow-up, Ms. Kitten noted the following regarding Anderson's condition:

> [Anderson] tells me that she continues to have problems with inattentiveness. She has still been attempting to find a job within the correctional system to no avail. She has done some rare substitute teaching and enjoyed the work but is not getting many hours. She has continued to work through Voc Rehab and also has seen Rhonda Wykoff regularly. Cheryl maintains that she is sleeping okay and that her appetite has been good. She feels that the medication is helping her, but she still has some "down times" in which she is irritable and feels that she has unrealistic expectations.

(R. 295) Ms. Kitten increased Anderson's Zoloft dosage and "encouraged her to find other alternatives other than in the correctional system for work." (*Id.*)

In January 2004, Strattera was removed from Anderson's medication regimen due to the medication elevating her blood pressure. In any event, Anderson had not felt the medication was helping her inattention problems. (R. 298) After stopping the medication, she indicated in February 2004 that she thought it may have contributed to her anxiety symptoms. She continued to feel scattered and inattentive, but otherwise was doing well. (R. 299) In March and April 2004, Anderson stated she continued to do "quite well," and she was "interviewing for jobs." (R. 300, 304)

25

On August 24, 2004, Ms. Kitten completed a form entitled "Medical Opinion Re: Ability to do Work-Related Activities (Mental)." The form was cosigned by U.C. Okoli, M.D. On the form, Ms. Kitten opined Anderson would have a good ability to maintain regular attendance and be punctual within customary, usually strict tolerances; be aware of normal hazards and take appropriate precautions; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation. She opined Anderson would have a fair ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention for a two-hour segment; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; understand, remember, and carry out detailed instructions; set realistic goals or make plans independently of others; deal with the stress of semi-skilled and skilled work; interact appropriately with the general public; and maintain socially appropriate behavior. (*Id.*)

Ms. Kitten opined Anderson would have poor or no ability to work in coordination with or proximity to others without being unduly distracted; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; or deal with normal work stress. (R. 306) Ms. Kitten included the following handwritten notes on the form: "Cheryl would experience problems with co-workers in most or all work settings"; "Memory would be an issue"; "Cheryl would have problems with inattention/concentration in regular work setting"; "interaction with others long term would present a problem"; and "Cheryl would likely experience unrealistic expectations of others in workplace and become frustrated. Memory/attention are big concerns in a work place for Cheryl." (R. 306-07) Ms. Kitten estimated Anderson's impairments or

Case 3:06-cv-03066-MWB   Document 10   Filed 11/19/07   Page 26 of 42

treatment would cause her to be absent from work more than four days per month. (R. 308)  She indicated she was not sure Anderson would be able to manage benefits on her own, were they awarded.  (*Id.*)

### 3.    *Anderson's Vocational Rehabilitation History*

The record evidence indicates Anderson began meeting with Voc Rehab counselors sometime prior to January 4, 2002.  (*See* R. 164)  At that time, she expected to have three classes to complete before earning her degree.  Notes indicate Anderson was only planning to work part-time due to her back condition.  Voc Rehab authorized payment for Anderson to obtain a psychiatric evaluation, but she was slow to comply by making an appointment for the evaluation.  (*See* R. 163-64)

When Anderson met with her Voc Rehab counselor on May 24, 2002, the counselor expressed concern about whether Anderson would be able to benefit from her college training.  Anderson was noted to be "walking with a definite tilt to one side."  (R. 162) She was having problems in her classes due to her inability to sit for very long.  With Voc Rehab's assistance, Anderson obtained an extension of time to complete her coursework for one of her classes.  (R. 161)

After Anderson had her back surgery in the summer of 2002, she informed her Voc Rehab counselor that she was doing well and was applying for jobs.  The counselor noted Anderson was applying for jobs that required a background search, such as a probation/parole officer, and the counselor was "not optimistic about [Anderson's] chances for that type of employment."  (R. 160)  Anderson reported applying for various airport security jobs in August 2002.  (*Id.*)  On September 10, 2002, Anderson reported to her counselor that she was still looking for work, the job market was "very tight," and "she would take anything now."  (R. 159)  However, Anderson had refused to participate in a job seeking skills class through Voc Rehab.  The counselor also expressed some doubts

27

about Anderson's veracity, noting Anderson would talk with the counselor about an upcoming job interview, but a short time later she would seem to have forgotten all about it. (*Id.*)

Anderson talked with her Voc Rehab counselor on September 16, 2002, and expressed frustration that she was not getting job interviews in the corrections field or for state jobs. She was referred to a source to discuss possible job placement, but called her counselor back to report that she did not like the individual's attitude. The counselor advised Anderson that Voc Rehab would pay for her to gain additional computer skills, such as learning Excel, and Anderson agreed to check into classes. (R. 158) However, the counselor had "some difficulty seeing [Anderson] working successfully in a clerical position." (R. 152)

On October 16, 2002, Anderson told her counselor that she had interviewed for a janitorial position in Ames, Iowa. The counselor noted that type of job was questionable for Anderson and would have to be light work due to Anderson's back condition. (*Id.*) Anderson worked for two weeks at a Subway, but quit because the work hurt her back too much. (R. 156) She obtained a certificate to do substitute teaching, but she had moved into her own apartment and did not have a telephone, so she had not applied for teaching jobs. (*See* R. 152, 154-55)

The record indicates Anderson continued to apply for corrections-related positions, without success. Anderson often would become angry and display somewhat inappropriate behavior either at a job interview, or afterwards if she was not hired. For example, Anderson applied for a supervisory position at the Anamosa State Prison. She told her Voc Rehab counselor she had expected her physical limitations to be accommodated at Anamosa, but instead the following took place, according to the Voc Rehab notes:

> [Anderson] was handed a list of the essential job duties for the position right away and was asked to read them. She felt the personnel in the office were very unprofessional and felt that

28

> the receptionist was laughing at her. She said that her
> disability wasn't a laughing matter. The receptionist accused
> her of raising her voice and the HR person cut [Anderson] off
> when she tried to explain something. Evidently, [Anderson]
> said something to the HR person about the accommodations
> and the other people in the office jumped right in to defend
> her. [Anderson] said that she had wanted to apply for a
> supervisory position earlier but the paperwork had been lost.
> She also faulted them for not following procedures in the fine
> print on the application where it said to go to such and such a
> page if an applicant mentioned a disability.

(R. 157) Anderson's mental health counselor eventually raised the issue with Anderson that due to her PTSD, a job in criminal justice or law enforcement was unlikely to be a good fit for her. (R. 141-43)

The Voc Rehab counselor's notes contain numerous observations about Anderson's behavior and thinking patterns that would be counterproductive to her obtaining employment. Anderson apparently filed a claim against the Second Judicial District, alleging mental and physical discrimination and gender discrimination in connection with a job application. Anderson's Voc Rehab counselor expressed concern that Anderson might get a reputation for being litigious, which would adversely affect her ability to find work. (R. 148-49)

At one point, Anderson suggested she might go to truck driving school. However, the course tuition was $5,000, which she could not afford. In addition, her counselor noted Anderson's back condition and her medication regimen likely would preclude truck driving. (R. 146)

The counselor noted Anderson's appearance was very informal and she dressed casually for job interviews, which the counselor believed would make Anderson appear less intelligent than she is. (R. 142)

Throughout the time Anderson worked with a Voc Rehab counselor, Anderson continued to look actively for work. However, she often applied for jobs for which she

29

was not well suited or was not qualified. She declined to take steps recommended by both her Voc Rehab counselor and her mental health counselor. Anderson believed herself to be over-qualified for entry-level positions and did not apply for them. She expressed some interest in obtaining further education, perhaps to teach special education, but the record does not contain evidence that she followed up on homework assignments from her Voc Rehab counselor to get more information relating to educational opportunities or improving her job seeking skills. (*See generally* R. 141-64)

Eventually, in November 2005, Anderson's file at Voc Rehab was closed. As reason for the closure, notes indicate, "We have discussed options and cannot come up with a suitable, attainable job goal." (R. 343) Notes further indicate Anderson "would like to work." (*Id.*)

### 4. *Vocational expert's testimony*

The ALJ did not question the Ve. Anderson's attorney asked VE Carma Mitchell the following hypothetical question:

> Please consider a 33-year-old individual who is alleging an onset date of March 14th of 2000, has a major depressive disorder and a cluster hate [sic] personality disorder. She is unable to work in proximity to others. She is unable to ask simple questions or request assistance. She is unable to accept instructions from supervisors. She's unable to get along with co-workers without unduly distracting them. She's unable to deal with normal work stress, interaction . . . with people, co-workers or public, on a long term basis would be a problem for her. The hypothetical individual is extremely anxious and that makes her very forgetful and scatterbrained. In addition, the individual has chronic back pain that limits her ability to sit and to stand. . . . Sit and stand for about six hours in an eight hour work day but with the need for unscheduled breaks, meaning that if she's sitting she needs to get up and stand, if sh[e]'s standing she needs to be able to sit. And with the ability frequently lifting 10 pounds, occasionally lifting 20

30

pounds.  With that, is she capable of returning to any of the
past relevant work?

(R. 379-80)  The VE indicated the hypothetical individual would be unable to return to any
of Anderson's past relevant work due to her "inability to ask simple questions, inability
to get along with co-workers without distracting them."  (R. 380-81)  The VE stated, "The
. . . limitations regarding handling work stress I feel would be the major ones."  (R. 381)
The VE stated an individual who (1) is disruptive to others, (2) distracts others from doing
their work, (3) can only tolerate minimal work stress, or (4) is unable to ask simple
questions, would be unable to maintain competitive employment.

### 5.    The ALJ's decision

The ALJ found Anderson has not engaged in substantial gainful activity since
November 7, 2001.  (R. 12-13)  She found Anderson has severe impairments consisting
of "depression, personality disorder, post-traumatic stress disorder, and cluster A
personality disorder, as well as obesity and status post lumbar spine surgery with
continuing low back pain."  (R. 14; *see* R. 13-14)  However, she found Anderson's
combination of impairments does not have more than a minimal effect on her ability to
perform basic work-related activities.  (R. 14)

The ALJ found not fully credible Anderson's assertion that she is completely
disabled.  The ALJ noted Anderson earned "fairly substantial" wages from 1991 to 2001,
which the ALJ found to be inconsistent with Anderson's "contention that her mental
problems have prevented her from working throughout her life."  (R. 16)  The ALJ relied
on the State agency assessments that indicate Anderson has only mild to moderate mental
limitations, and she is able to work at the light exertional level.  (*Id.*)

The ALJ determined that Anderson retains the residual functional capacity to lift and
carry twenty pounds occasionally and ten pounds frequently, and sit, stand, and walk for
six hours in an eight-hour day.  The ALJ indicated Anderson cannot climb ladders, ropes

31

or scaffolds, but she can perform all other postural activities occasionally. She found Anderson to have moderate mental limitations in four areas: maintaining concentration, persistence, and pace; dealing with the public; accepting instruction and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. She further found these limitations cause Anderson mild difficulties in her activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; and moderate difficulties in maintaining social functioning; but would not cause her to have episodes of deterioration or decompensation of an extended duration. (*Id.*)

The ALJ found Anderson could return to her past relevant work as a security guard of industrial and commercial properties, a job the ALJ indicated is semi-skilled and generally performed at the light exertional level. The ALJ found the hypothetical question Anderson's attorney asked the VE did not correspond with Anderson's residual functional capacity as determined by the ALJ. (R. 17) Because the ALJ found Anderson could return to her past relevant work, she stopped the sequential evaluation at step four, and found Anderson not to be disabled. (*Id.*)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . .

32

in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, ___ F.3d ___, 2007 WL 2593631 at * 2 (8th Cir. Sept. 11, 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003. First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

33

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).  *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience.  20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*.  The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3).  The Commissioner also will consider certain

34

non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

35

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health &*

36

*Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823

Case 3:06-cv-03066-MWB   Document 10   Filed 11/19/07   Page 37 of 42

F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).


## IV.  ANALYSIS

Anderson argues the ALJ erred in finding she could return to her past relevant work as a security guard, stopping the ALJ's evaluation at step four of the sequential evaluation process. Although Anderson acknowledges her burden to demonstrate, at step four, that she is unable to return to her past relevant work, she argues she met this burden "by pointing out that her mental impairment interfered with her ability to perform the work as

38

a security guard to the extent that she was discharged." (R. 6 at 15) Anderson asserts the record is incomplete with regard to the nonexertional demands of the security guard job, and given her nonexertional impairments as found by the ALJ, additional evidence would be required in order for the ALJ to determine that she could return to the security guard job. (*Id.*) In a similar vein, Anderson argues the ALJ failed to properly evaluate the evidence from Nurse Kitten. (*See* Doc. No. 6 at 15-18; Doc. No. 8 at 4)

The Commissioner argues the ALJ properly relied on the DOT description of the security guard job (*see* R. 6 at 4-5 n.5), and the VE's description of the job on the past relevant work summary (*see* R. 140), which describe exertional and nonexertional job requirements. He argues Anderson failed to meet her burden to make a *prima facie* showing that she is unable to return to her past relevant work. (Doc. No. 7 at 4-5) The Commissioner further argues the ALJ evaluated Nurse Kitten's assessment properly. (Doc. No. 7 at 5-8)

Anderson responds by arguing the ALJ based her assessment of Anderson's physical residual functional capacity ("RFC") on a consultant's paper review of the record that occurred "prior to February 27, 2002," completely ignoring all of the evidence from Anderson's treating and examining medical providers after that date. (Doc. No. 8 at 2-3; *see* R. 16, citing Ex. 10F at 1-6; i.e., R. 223-28)

The ALJ gave little weight to Nurse Kitten's evaluation of Anderson's mental abilities, finding her assessment not to be persuasive. The ALJ found Nurse Kitten's assessment not to be supported by objective medical or clinical findings, and indicated her assessment "appear[ed] to be a restate[ment] of the claimant's subjective complaints." (R. 14) However, other than the state agency consultant's opinions from their paper review of the record, the record contains nothing to support this conclusion. Indeed, the overwhelming evidence of record supports Nurse Kitten's assessment. Furthermore, Nurse Kitten's assessment is in agreement with the assessment of Dr. Notch, Anderson's

39

treating psychiatrist from July 2000 to January 2002, that Anderson "would likely be unable to handle the stress of work on a competitive basis," and she "has marked limitations in her ability to relate effectively in on ongoing manner with supervisors and coworkers." (R. 188-89)

The ALJ noted that despite Anderson's alleged mental disability, Anderson continued to work with Voc Rehab, apply for jobs and go on interviews, do volunteer work, and occasionally work as a substitute teacher. The ALJ found this level of activity to be inconsistent with Nurse Kitten's assessment of Anderson's mental RFC. The record does not support this conclusion. The evidence indicates that each time Anderson went for a job interview, she had problems, related either to her interactions with others or to her unrealistic expectation that she would be able to continue working in criminal justice. Although she made several work attempts after her alleged disability onset date, each of them was unsuccessful. The fact that Anderson continues to express a desire to work and even continues in her attempts to find suitable employment is not evidence that she retains the mental RFC to work. *See Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982) (Claimant "consistently demonstrated a desire to be gainfully employed, but . . . met with little success," either in job training programs or "in the 'real world.'" Court held, "There is virtually no evidence in the record to support a finding that [the claimant] can engage in substantial gainful employment."); *cf. Smith v. Heckler*, 735 F.2d 312, 318-19 (8th Cir. 1984) (claimant's "history of work attempts . . . substantiates the testimony that [he] simply lacks the basic mental ability to follow directions without constant supervision") (citing *Tennant*).

The court finds the ALJ erred in discounting the opinions of Nurse Kitten, an "other medical source," where her opinions are supported by evidence from Dr. Notch, an "acceptable medical source," as well as other evidence of record. *See Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003). This is particularly true where Nurse Kitten was

40

part of a "group of medical professionals, including therapists and nurse practitioners who worked with claimant's psychologist, where the treatment center used a team approach." *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006) (summarizing *Shontos*). The overwhelming evidence of record supports a conclusion that Anderson would be unable to return to her past relevant work as a security guard, or to any of her other past relevant work. As a result, the ALJ erred in ending his evaluation at step four of the sequential evaluation process.

Ordinarily, this conclusion would result in remand of the case for further proceedings in order for the Commissioner to determine whether Anderson is able to perform other work that exists in sufficient numbers. However, in this case, the court finds the hypothetical question posed to the VE by Anderson's attorney precisely stated Anderson's particular mental and physical impairments. *See Tennant*, 682 F.2d at 711. When faced with those impairments, the VE testified Anderson would be unable to return to any of her past relevant work, nor would she be able to maintain any type of competitive employment. (*See* R. 379-81) A vocational expert's testimony that is based on a properly phrased hypothetical question constitutes substantial evidence. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). As a result, remand is unnecessary. "Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984).

41

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[4] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and payment of benefits.

**IT IS SO ORDERED.**

**DATED** this 19th day of November, 2007.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[4]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

42